# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|                                   |   |                          |
|-----------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA          | : |                          |
|                                   | : | Criminal No. 3:21-CR-56  |
| -vs-                              | : |                          |
|                                   | : | (J. Mannion)             |
| WALTER KENNETH PARFAITE,          | : |                          |
| a/k/a "Kenny"                     | : |                          |
|                   Defendant       | : | (Electronically filed)   |

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S PRE-TRIAL MOTIONS

Defendant Walter Kenneth Parfaite, a/k/a "Kenny" has filed several motions within his omnibus motion for pre-trial relief, including several motions *in limine*, in the above-captioned matter.   The Government previously filed for a motion for an extension of time to respond to Defendant Parfaite's Motions by November 8, 2021. Because each of defendant's motions are either moot or otherwise without merit, they should be denied.

## I.    PROCEDURAL HISTORY

On February 23, 2021, co-defendant Matthew Luce was charged by a criminal complaint with two counts of Possession with Intent to

Distribute Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1).

On March 3, 2021, an Indictment was filed charging both Defendant Luce and Defendant Parfaite with violations of Conspiracy to Distribute Methamphetamine and Heroin, in violation of Title 21, United States Code, Section 846, Possession with Intent to Distribute Methamphetamine, in Violation of Title 21, United States Code, Section 841(a)(1), and Possession with Intent to Distribute Heroin.   Defendant Luce is further charged, in the same indictment, with an additional three counts of Distribution and Possession with Intent to Distribute Methamphetamine and an additional count of Distribution and Possession with Intent to Distribute Heroin, all violations of Title 21, United States Code, Section 841(a)(1).

On March 12, 2021 the defendants appeared separately before the Honorable Karoline Mehalchick, United States Chief Magistrate Judge, and entered pleas of not guilty.

After several motions for an extension of time to file pre-trial motions, on October 4, 2021, Defendant Parfaite filed an omnibus

motion for pre-trial relief.   The Government later filed a motion for an extension of time to respond to Defendant Parfaite's motion by November 8, 2021.

On October 6, 2021, Defendant Luce filed an unopposed motion for extension of time to file pretrial motions and motions in limine.

On October 7, 2021, the Government filed Motions in limine along with a Brief in Support regarding the use of Defendant's Luce and Parfaite's criminal history for impeachment purposes under Federal Rule of Evidence 609, if they do testify on their own behalf.   Both Defendants filed Briefs in Opposition to the Government's motion. These motions are currently pending.

On October 8, 2021, this Court issued a Scheduling Order directing Defendant Luce to file any pretrial motions and motions in limine by November 8, 2021. Trial as to both defendants was continued until December 27, 2021.

## II.   <u>FACTUAL BACKGROUND</u>[1]

Beginning in January of 2021, detectives from the Monroe County District Attorney's Office ("MCDA") as well as agents and Task Force officers with the Federal Bureau of Investigation ("FBI") began investigating reported sales of methamphetamine in Monroe County. On January 6, Detective Kim Lippincott of the MCDA ("Det. Lippincott") met with a confidential informant ("CI"), who identified Matthew Luce, a/k/a "Luck", ("Luce") as his/her source of methamphetamine.

### <u>UN-RECORDED BUY</u>

On January 6, 2021, the CI conducted a controlled purchase of methamphetamine from Luce from Luce's hotel room at the Quality Inn in East Stroudsburg, PA.    The CI arranged for the purchase at the hotel, but the call was not recorded. At the hotel, investigators observed Luce exit the rear of the hotel and meet with the CI. The CI then

---

[1] The "Factual Background" is derived from reports of the Monroe County District Attorney's office, the Federal Bureau of Investigation, interviews with witnesses, review of electronic data recovered from this case, and other information. However, defense counsels and defendants are cautioned that trial preparation is ongoing and may reveal additional facts not contained therein.

proceeded directly to a meeting with investigators and provided them with a bag containing 3.5 grams of methamphetamine, which the CI had purchased from Luce.

## FIRST RECORDED BUY

On January 8, 2021, the CI arranged to purchase methamphetamine and heroin from Luce during a recorded phone call. During the phone call, Luce stated he would sell the CI, "a ball and a bunny," meaning an eight-ball of methamphetamine and a bundle (10 bags) of heroin.   Luce also stated that the CI should come to Dalton Lane in Chestnuthill Township.   Later that day, the CI met with LUCE in the CVS pharmacy parking lot at State Road and Route 115 in Chestnuthill Township, Monroe County, PA.   Investigators searched the CI prior to the sale and provided $180 in pre-recorded buy money to the CI.   A blue pickup truck, PA # ZLK3090 (registered to a George Schlect who resides at 113 Dalton Lane, Chestnuthill, PA) pulled into the parking lot with Luce in the front passenger seat.   Investigators observed Luce open the door, receive money from the CI and give the CI drugs in exchange.   The CI then proceeded directly to a meeting with

5

investigators and provided them approximately 7 grams of methamphetamine and a quantity heroin to the investigators.

## SECOND RECORDED BUY

On February 17, 2021, the CI again arranged with Luce to purchase methamphetamine via recorded call.   Luce informed the CI that he was now staying at the Paramount Motel, Room 3, 2220 Milford Rd., East Stroudsburg, PA.   Luce and the CI made arrangements for the CI to purchase an "eight-ball" of methamphetamine from Luce later that day.   The CI was taken to the Paramount Motel where an undercover officer dropped the CI off and observed the CI enter Room 3 of the motel. The CI had been searched and given pre-recorded buy money prior to being dropped off at the motel.   Three minutes later, the CI exited the room and gave the undercover a bag containing approximately 3.5 grams of methamphetamine which the CI purchased from Luce.

The CI stated that there were other individuals in the hotel room, including a young girl, and a woman who the CI observed shooting

6

heroin in the hotel room bathroom.    Three cars were also observed parked outside the room, including one belonging to Marli Plattenburg, (PA # LLY2948 2004 Hyundai Sante Fe) who the CI identified as the woman shooting heroin.

## THIRD RECORDED BUY

On February 22, 2021, again arranged with Luce to purchase methamphetamine via recorded call.   Luce and the CI made arrangements for the CI to purchase an "eight-ball" of methamphetamine from Luce at the Paramount Hotel.   The CI was taken to the Paramount Motel where an undercover officer dropped the CI off and observed the CI enter Room 3 of the motel. The CI had been searched and given pre-recorded buy money prior to being dropped off at the motel.   Three minutes later, the CI exited the room and gave the undercover a bag containing approximately 7 grams of methamphetamine which the CI purchased from Luce.   The CI's purchase from Luce inside the motel was recorded.

## CI #2

On February 18, Det. Lippincott and Det. Orlando from the MCDA, conducted an interview with CI#2 at the Monroe County Correctional Facility.   In sum and substance, CI #2 informed them that, in December of 2020, the CI began to buy 10-20 bags of heroin (approximately 1-2 grams)   from Luce every day and that LUCE's heroin was bagged in blue bags.   The CI further informed the detectives that the CI also purchased methamphetamine from Luce for the purposes of resale. The CI also provided text messages from Luce regarding drug purchases.

## SEARCH WARRANT

On February 23, 2021, at approximately 6:00 a.m., Det. Lippincott, aided by other law enforcement officers, including the Pennsylvania State Police Special Emergency Response Team (SERT)[2],

---

[2] In a previous filing, the Government named the SERT team as the Monroe County SWAT team, this was erroneous. The SERT team, like a SWAT team, consists of heavily armed and armored police personnel who specialize in high-risk situations such as the execution of search warrants on suspects who are likely to be armed and

executed a federal search warrant at the Paramount Motel, Room 3,

2220 Milford Rd., East Stroudsburg, PA. The SERT team members

made entry into the hotel room through an explosive entry, where they

blew the door off the motel room in order to gain access the room.   The

SERT team members moved inside the room and secured all the

individuals found therein.   Investigators immediately followed behind

the SERT team and found several individuals secured inside, including

Luce, and defendant William K. Parfaite, a/k/a "Kenny" ("Parfaite").

Also found inside the room were Ashley Grimes, Ryan Yesner, Amy

Gearhardt, and Kayla Fields.   Parfaite had an open Pennsylvania

State Parole warrant.

Upon entering the room, SERT members placed Parfaite on the

ground and quickly searched him for any weapons.   Investigators later

found approximately $1300 found on Parfaite's person, including the

pre-recorded buy money from the February 22, 2021, controlled

purchase, as well as a key to the motel room.     No other individuals

had any cash on them.   The following items were recovered from inside

---

dangerous.

the motel room:[3]  Approximately 8 grams of heroin from bags in various locations throughout the room, including the bathroom; approximately 17 grams of methamphetamine in various locations throughout the room, including the bathroom;   a ledger recording sales, debts, and phone numbers, including the "cash app" username and password for Parfaite[4]; numerous bags containing drug paraphernalia, mainly needles but also empty bags; and numerous cellphones.

During the search of the room, Det. Lippincott separated the six individuals found therein, in order that they did were not able to discuss the case amongst themselves.   Parfaite stated to Det. Lippincott, in sum and substance, "I don't know anything about it, just take me jail." Parfaite was then transported to the Monroe County District Attorney's Office by Police Officer Ralph Ortega, of the Stroudsburg Police Department.   During the drive to the District

---

[3] This list is just a summary of some of the items found in the room and not an exhaustive inventory.
[4] The names of many of the customers in the ledger are described as such in the audio recordings of Luce and other individuals described below.

Attorney's Office, Parfaite did not say anything to PO Ortega regarding an attorney.

After the execution of the search warrant, investigators interviewed all the individuals found therein.   During the course of those interviews, defendants Luce and Parfaite were implicated as distributors of methamphetamine and heroin from the motel room. The amount of controlled substances, types of controlled substances, and length of time that the defendants agreed to distribute the controlled substances was determined to be above 50 grams or more of methamphetamine and 100 grams or more of heroin, and to have started almost immediately upon both the defendant's release from prison, in 2020 for Luce and in January 2021 for Parfaite.

## TEXT MESSAGES

During the course of the interviews, the owners of the above-described cellphones were also identified.[5]   An extraction report from the above-described telephones shows that defendants Luce and

---

[5] The identity of the cellphones owners was confirmed by records found on the phones' extraction reports.

Parfaite communicated to each other and with other individuals, both known and unknown to the Government, about the distribution of controlled substances, including methamphetamine and heroin.   These text and Facebook communications also showed that Luce and Parfaite had conspired to possess with intent to distribute and to distribute controlled substances.   In particular, the communications shows that Parfaite would purchase quantities of controlled substances from Luce directly, or from a common source, "Mikey', who resided in the Fox Hill area of Stroudsburg, Monroe County, Pennsylvania, for resale or distribute. Parfaite would also introduce customers to Luce after which Luce would continue to supply said customers with controlled substances.   In particular, some of the conversations between Luce, Parfaite, and other co-conspirators, namely Michael Sparano, a/k/a "Mikey" establish that Parfaite, Luce, and Sparano were conspiring together to distribute heroin and methamphetamine within Monroe County, and elsewhere. In particular, Luce and Parfaite engaged in the following conversations, in sum and substance, during the timeframe of the alleged conspiracy:

On or about January 12 through January 13, 2021:

> PARFAITE[6]: Yo bro its k where u at
>
> PARFAITE: Yo where u at need to see u
>
> PARFAITE: What can u give me for what I have $90
>
> LUCE:[7]  I'll give you 3.

...

> PARFAITE, Can I send loz to u for them 2
>
> LUCE: I got one right now skoob...got fast n loud too.[8]

On or about January 18, 2021, Luce and Parfiate, using the same accounts, engaged in the following conversation:

> PARFAITE: Yo bro how is the slow keep it 100[9]
>
> LUCE: It's real good...I just got narcaned from its

---

[6] These communications were from Luce's phone contact "Kenny Parfet" Number 15704325060. All excerpts are just that, excerpts, and do not reflect the entire conversations.

[7] "Luce" here reflects communications sent from m.luc1986@gmail.com, the "owner" account from Luce's mobile phone forensic analysis.

[8] "Fast" and "loud" are common slang terms for different types of controlled substances, namely cocaine and methamphetamine.

[9] "Slow" is a common slang term for heroin/fentanyl or other opioids.

On or about January 29, 2021, Luce and Parfaite, engaged in the following conversation:[10]

>PARFAITE: Livin bro looking for some food[11]
>
>LUCE: How much you lookin for slime
>
>PARFAITE: Breezy

On or about February 8, 2021 and February 10, 2021, Luce and Parfaite engaged in the following conversation:[12]

>PARFAITE: yo bro it's k I need to talk to u
>
>PARFAITE: I'm all good I'm out here at Fox Hill trying to do grab but I can't go right to the man
>
>LUCE: What you need n I'll go to him
>
>PARFAITE: Im trying to see what the numbers are like but one or 2 whole ones for eight now
>
>LUCE: I'm about to be there. I'm passing comptons right now
>
>…

---

[10] This conversation, taken from Luce's mobile phone digital forensic analysis, consists of contacts "Matthew Luce(owner) utilizing 100013112525960, and "Kenny Parfaite" utilizing number 100061147666601.   These account numbers indicate the conversation occurred via Facebook Messenger.

[11] "Food" is another common slang term for controlled substances.

[12] In this conversation, taken from Luce's mobile phone digital forensic analysis, "Luce" is using m.luce1986@gmail.com, while "Parfaite" is the contact, "Kenny Parfaitte," 19082835598.

14

PARFAITE: Yo bro it's k I need ur help fast

PARFAITE: Can I plug me I. With Mikey I'm up at Fox Hill an my ppl are not Answering me now an I have 5-60.

PARFAITE: I have to get this asap I don't have any food an 600+ to shop with

PARFAITE: What's up can I help me out with this bro pls I need to get back towork[13]

On or about January 20, 2021, Parfaite sent Michael Sparano the following messages, which was recovered from Sparano's mobile phone digital forensic analysis:

PARFAITE: Yo bro its k I tried everyone with no answer can I come c u

On or about February 21, 2021, Luce engaged with contact "Molly" at 15702020667, and had the following conversation:

MOLLY: I need some moreee. Okay so, the situation is, I got someone here that has a good amount of money. But Im not sure like, how much you'd charge me for like, bigger amounts soI don't' what to tell them.   How much is a G or 2 G's, or like an 8 ball of it. I know you said you're not really selling it like that, but like you also said 150 is a good price for an 8ball.   But like, I am trying to move as much as I can and make some shit off it and I know I can move it like that you know

---

[13] It is the Government's position that "Mikey," referenced here, is Michael Sparano, who has been indicted under 3:21-CR-108, and was arrested for distributing controlled substances from the Fox Hill area of Monroe County.

what I mean? So can you throw me some prices for some amounts please?

   LUCE: Mami I ain't selling work like that...I mean I could look out n deal with certain people if it was with it...mami right now best I can do is a hundred ten a gee, and that's me only getting ten fuvkin dollar.[14]

## LUCE STATEMENT[15]

   Once at the Monroe County District Attorney's Office, Defendant Luce was interviewed by investigators with the MCDA. [16]  After being read his Miranda rights, and making a voluntary waiver of those rights, Luce spoke at length about a series of open murder investigations within Monroe County.[17]   Approximately one hour into that interview, the investigators shifted the focus of the interview away from previous unsolved violent crimes and to the distribution of controlled substances

---

[14] "G" or "Gee" refers to a kilogram of controlled substance, and an "8ball" refers to an 1/8 lbs of controlled substance.

[15] A true and accurate copy of Defendant Luce's unredacted audio recorded statement is attached to this response as Attachment A.   A true and accurate copy of the video recording (without sound) is also attached as aprt of Attachment A.

[16] The interview room at the MCDA experienced technical issues on the day on question.   Luce, the first individual to be interviewed, was video and audio recorded, however the video does not contain sound. The remaining individuals, including Parfaite, were only audio recorded.

[17] The First approximately one hour of Defendant Luce's statement is not relevant to the current case, except to establish his full voluntary waiver, and a brief section in which he describes his sobriety in the interview.

that Luce and Parfaite were responsible for from the Paramount Motel.

During that interview Luce made several inculpatory statements about

his own drug distribution, as well as the distribution of controlled

substances by Parfaite, and their conspiracy to do the same.   In

particular, Luce stated, that he sold heroin and methamphetamine,

that he started around Thanksgiving of 2020, that his sources were

Michael Sparano and Frank Troutz, that he bought 2 sleeves ("10g") of

heroin from Sparano recently but that he normally bought 6-7grams of

heroin per day from Sparano, that he and Defendant Parfaite were

distributing drugs from the Paramount Motel room.

### PARFAITE STATEMENT[18]

After being transported to the MCDA office, Parfaite was taken to

a holding cell until the interview room was available.   This holding cell

is adjacent to the office of Det. Brian Webbe of the MCDA.   During

Parfaite's time in the holding cell, less than three hours, Parfaite was

offered opportunities to use the bathroom on several occasions. Parfaite

---

[18] A true and accurate copy of Defendant Parfaite's unredacted audio recorded statement is attached to this response as Attachment B.

was also offered water on several occasions by Detective Mario Orlando of the MCDA.   At one point, Parfaite became agitated and started to bang loudly on the door and wall of the holding cell. Det. Webbe, being adjacent to the cell, inquired what was the matter. According to Det. Webbe, Parfaite complained of being cold and thirsty. He was again offered water.   At no point at the MCDA, prior to his recorded interview, did Parfaite ask to speak with a lawyer.

At approximately 9:50a.m., Defendant Parfaite was taken to the interview room within the MCDA and read his Miranda warnings. Parfaite voluntarily waived those rights and agreed to speak with investigators. During that interview, Parfaite stated the following, in sum, and substance: That he had rented the motel room for Defendant Luce and that he had been paid in cash and drugs from the Luce and the other people in the motel room, that he used drugs and sold drugs to support his habit, that he gave drugs away to the other people in the motel room, and that he received his drugs from the other people in the motel room.

At approximately 16:44 minutes into that interview, Parfaite stated, in sum and substance, "*Where the fuck is my lawyer? I asked for my lawyer when they patted me on the ground?*" (See Attachment B, 16:44).   The detective in the room[19], stopped questioning Parfaite and spoke to Parfaite about his newly acquired tattoo, stating, "*That's actually a pretty fucking dope tattoo bro, don't do that…it's going to scab up.*" [20](16:55).   Parfaite then re-initiated the conversation by stating, "*Like literally we had just cleaned everything up. I'm going to take a piss and they kick in the door.   Picked a helluva day to come, picked the day with the least amount of activity*"(17:07).

## CHARGING DOCUMENTS AND DISCOVERY

Defendant Luce was charged by criminal complaint with two violations of Title 21, United States Code, Section 841(a)(1), Possession with the Intent to Distribute Controlled Substances.   Defendant Parfaite was charged in state court with violations of Pennsylvania

---

[19] The other detective had left the room to get Parfaite water, at his request.
[20] Referring to Defendant Parfaite scratching his tattoo.

drug law and was detained on those charges as well as his open state parole warrant.

On March 3, 2021, a grand jury charging the defendants with violations of Conspiracy to Distribute Methamphetamine and Heroin, in violation of Title 21, United States Code, Section 846, Possession with Intent to Distribute Methamphetamine, in Violation of Title 21, United States Code, Section 841(a)(1), and Possession with Intent to Distribute Heroin.   Defendant Luce is further charged, in the same indictment, with an additional three counts of Distribution and Possession with Intent to Distribute Methamphetamine and an additional count of Distribution and Possession with Intent to Distribute Heroin, all violations of Title 21, United States Code, Section 841(a)(1).

After the Indictment, the Government made several discovery disclosures.   On March 11, 2021, the Government provided each defendant with the police reports and investigation paperwork for the above-described recorded calls, pictures of the pre-recorded buy money, pictures and video from the execution of the above-described search warrant, criminal histories of the defendants, a copy of the search

warrants and applications for the above-described Paramount Motel Room, and search warrant materials for relevant social media accounts.

On April 23, 2021, the Government provided further discovery to Defendant Luce, including but not limited to: the audio/visual recording of his February 23, 2021, statement to investigators, digital forensic reports of the cellular phones recovered from the motel room on February 23, 2021, Facebook records from the above-described social media accounts, digital forensic reports from the cellular phone of unindicted co-conspirator Michael Sparano, the consent to search paperwork from Ashley Grimes, Amy Beth Gearhart, Kayla Fields, the Miranda waiver form of Amy Beth Gearhart, and the Federal Bureau of Investigation ("FBI") 302 form regarding the execution of the search warrant on February 23, 2021.

On April 23, 2021, the Government provided the same materials to Defendant Parfaite, except the Government provided Defendant Parfaite with his February 23, 2021 recorded statement, not Defendant Luce's statement, and did not provide the digital forensic report of Michael Sparano.

On June 21, 2021, Defendant Parfaite met with prosecutor, Det. Lippincott, and another investigator, along with defense counsel and a defense counsel investigator in order to conduct a proffer interview.

On July 16, 2021, the Government provided further discovery to Defendant Parfaite, including, but not limited to, the following: the complaint affidavit and detention order concerning Defendant Luce, interview notes from the February 23, 2021, police interviews with Ashley Grimes and Ryan Yesner, a second copy of the FBI 302 described above, the paperwork regarding the consensualization of phone recordings, described above, and two laboratory reports from the Drug Enforcement Agency laboratory.[21]

On August 10, 2021, the Government provided a summary of the expected testimony of the CIs in this case to Defendant Parfaite. In that a summary, the Government also disclosed the expected testimony of the other individuals who were either present in the room with the

---

[21] These reports were for the small amount of marihuana and powder cocaine recovered from the Paramount Motel. Neither controlled substance is charged in this case and the Government does not plan on eliciting any facts about either controlled substance in its case-in-chief.

defendants on February 23, 2021, or who bought controlled substances from the defendants prior to February 23, 2021.

On November 5, 2021, the Government provided additional discovery to both defendants, including, but not limited to the following: the full, unredacted statements of both defendants, the digital forensic report of Michael Sparano to Defendant Parfaite, the jail calls from Defendant Parfaite from Lackawanna County Prison, excerpts of the text conversations between co-conspirators Luce, Parfaite, and Sparano, the MCDA incident report, the recorded interview of unindicted co-conspirator Michael Sparano, and additional criminal history paperwork regarding Defendant Parfaite.   Overall, the Government has provided both defendants with 1145 pages of discovery, in addition to six digital forensic reports, Facebook records from five social media accounts, approximately 140 photographs, all the recorded interviews of the co-conspirators in this case, and all the laboratory reports from the analysis of any controlled substances currently in the Government's possession.

The only items in the Government's possession that have not been turned over the defendants are the recorded calls between the CI and Luce, described above[22], the Grand Jury minutes of Det. Lippincott, and any recorded statements made by Government witnesses, which the Government classified as Jencks material.   The Government does not currently possess any further laboratory reports concerning the heroin, fentanyl, or methamphetamine recovered in this case since these items have not been examined as of the time of this response.

On October 4, 2021, Parfaite filed a motion for pre-trial relief, included therein were seven particular motions for relief.

The government will respond to each of the defendant's motions in turn.

## III.   ARGUMENT

### 1.   Motion for Discovery

### a. Background

Discovery in a criminal case is not as broad as permitted in a civil case.   Rather, criminal discovery is specifically delineated by Federal

---

[22] These recordings, and all the physical evidence recovered in this case, are available for inspection by defense counsel and defendant upon request.

Rule of Criminal Procedure 16, the <u>Jencks Act</u>, and constitutional

requirements.     <u>United States v.</u> <u>Ramos</u>, 27 F.3d 65, 68 (3d Cir. 1994).

These rules have been carefully developed over many years to

accommodate many relevant concerns, including the faster progress of

criminal trials subject to the Speedy Trial Act, the defendant's right to

avoid self-incrimination, and the government's interest in protecting

witnesses and the secrecy of grand jury proceedings.

    With respect to the government's obligation to produce discovery,

the law requires the following:

    <u>Rule 16.</u> Under Federal Rule of Criminal Procedure 16 (a)(1),

upon a defendant's request, the government must produce the following

information:   (1) defendant's oral statements made in response to

interrogation by a person defendant knew was a government agent, as

well as defendant's written and recorded statements (Rule 16 (a)(1)(A)

and (B)); (2) defendant's prior record (Rule 16 (a)(1)(D));   (3) documents

and objects that are material to the defense, the government intends to

use in its case-in-chief at trial, or that were obtained from the defendant

(Rule 16 (a)(1)(E));   (4) reports of physical or mental examination and

any scientific tests or experiments (Rule 16 (A)(1)(F)); and (5) a summary of expert testimony the government intends to use, including the witness's opinions, the basis and reasons for those opinions and the witness's qualifications (Rule 16 (a)(1)(G)).

Rule 16 expressly limits discovery to these items; beyond the specific items described above, "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agents in connection with investigating or prosecuting the case.   Nor does this rule authorize the discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided by 18 U.S.C. § 3500." Fed.R.Crim.P. 16(a)(2).   Criminal defendants may not embark on a broad or blind fishing expedition among documents possessed by the government.   See Jencks v. United States, 353 U.S. 657, 667 (1957).

**The Jencks Act.**   The Jencks Act, 18 U.S.C. § 3500, requires the production of testifying witness statements.   The Act requires that the government produce the statements of any witness called at trial, after

the witness's testimony on direct examination is completed.   The

statements subject to production are limited by the Act to substantially

verbatim transcripts of a witness's utterances, or a statement which the

witness has formally adopted.

**Exculpatory Evidence.**   In a series of cases beginning with Brady

v. Maryland, 373 U.S. 83 (1963), the Supreme Court has set forth the

government's constitutional obligation to provide the defendant any

material in the government's possession which tends to exculpate the

defendant.   See Giglio v. United States, 405 U.S. 150 (1972).   As

explained in Kyles v. Whitney, 514 U.S. 419 (1995), such "Brady

material" includes any evidence which creates a reasonable probability

of a result other than conviction.

**Rule 12(b)(4)(B).**   Fed.R.Crim.P. 12 (b)(4)(B) provides that:

> [A] defendant may, in order to have an opportunity to
> move to suppress evidence under Rule 12 (b)(3)(C), request
> notice of the government's intent to use (in its case-in-chief
> at trial) any evidence that the defendant may be entitled to
> discover under Rule 16.

This rule, which requires the government to provide notice of its

intention to use certain evidence at trial, is limited to evidence needed

for a defendant's motion to suppress and evidence discoverable under
Rule 16.

### b. Specific Discovery Requests

In his motion for discovery, Parfaite has made sixteen specific discovery
requests, the Government will briefly address each, as many are either
already moot due to recent Government disclosures, are outside of the
scope of discoverable materials, or are simply not relevant to the
materials currently in the Government's possession.

1.   <u>Written or recorded statements by the Defendant</u>: These
items have been disclosed to both defendants.

2.   <u>Substance of oral statement made by Defendant</u>: These have
been turned over to both defendants.

3.   <u>Statements, confession or admissions made by Defendant</u>:
These have been turned over to both defendants.

4.   <u>Arrest reports and all other investigator notes</u>: These have
been turned over to both defendants.

5.   <u>All documents related into photographic ID procedures</u>: No
such documents are in the Government's possession, nor is the

Government aware of their existence.

6.    <u>Evidence seized in this case</u>:   An inventory of all items seized in this case has been turned over to both defendants. The items are available for physical inspection upon the request of either defendant.

7.    <u>All documents which the Government intends to use at trial as evidence in its case-in-chief</u>: All such documents have been turned over to both defendants, or are available for review upon request.

8.    <u>All documents material to the preparation of the Defense</u>: The Government has turned over all documents in their possession outside of information regarding the identity of Confidential Informants, Grand Jury Materials, and materials under <u>Jencks,</u> as discussed below.

9.    <u>All documents reflecting physical mental examinations, scientific tests, etc</u>:   The Government is not aware of any physical or mental examinations in this case. All forensic analyses of the controlled substances in the Government's possession have been

turned over to both Defendants.

10.     Brady/Giglio Material: The Government recognizes its on-going duty under Brady and its progeny to reveal evidence exculpatory to the defendant. Any such materials, if they do exist, has been turned over the Defendant. The Government is not aware of any Brady materials at this time that have not been disclosed to the defendants, however, the Government will continue to provide any such materials to defense counsel, if and when the Government becomes aware of its existence.

     The government is aware that Brady also requires the government to disclose information that could be used to impeach a government witness.   Giglio v. United States, 405 U.S. 150, 154 (1972).   The Third Circuit in United States v. Higgs, 713 F.2d at 44, held that due process requires only that Brady material be disclosed to the defense "in time for its effective use at trial." With respect to impeachment evidence – evidence that might be used by the defense on cross-examination to challenge the credibility of a government witness – the Higgs court held that the

defendant's "right to a fair trial will be fully protected if disclosure is made the day that the witness testifies." Id.

Notwithstanding the government's right to withhold Jencks and Brady/Giglio material until after a witness testifies, in the interest of full and cooperative disclosure, the government in this case intends to turn over its Jencks material to the defendant at least three days prior to trial, as is the custom in this District, along with additional impeachment material, if any, under Brady/Giglio.   The government, however, may, in specific limited circumstances, retain its rights under the Jencks Act and Brady/Giglio to withhold the production of Brady/Giglio material consistent with the applicable law, until after the witness testifies, for example, if the security of the witness would be affected by earlier disclosure.   Higgs, 713 F.2d at 44 (abuse of discretion for trial court to order disclosure of Giglio material a week prior to trial).   See also United States v. Jones, 612 F.2d 453, 455 (9th Cir. 1979) ("When the defense seeks evidence which qualifies as both Jencks Act and Brady material, the Jencks Act standards

control").

11.    404(B) Evidence: The Government is not seeking to
introduce evidence of other bad acts or crimes committed by either
Defendant which fall outside the scope of the Conspiracy in this
case, except for proper impeachment purposes if either defendant
testifies on their own behalf.

12.    Expert Witness Disclosure under Rule 16(a)(1)(G): The
Government anticipates calling at least two expert witnesses,
Detective Brian Webbe of the MCDA, who performed the forensic
analysis of the cellular phones recovered from the Paramount
Motel Room, and the Forensic Chemist who performed the
analysis of the alleged controlled substances recovered in the
course of the investigation into this case. At the time of this
response, no such analysis has occurred, nor has any report been
created for the controlled substances charged in this case.[23] The
Government will provide all requested materials in advance of

---

[23] Two analyses have been performed, for the small amounts of marihuana and
powder cocaine recovered from the Paramount Motel. Neither controlled substance
is charged in the present indictment, nor is the Government introducing evidence
concerning either controlled substance, as discussed above.

trial.

13.   <u>Early Jencks Disclosure:</u> The <u>Jencks</u> Act states: "No

statement or report in the possession of the United States which

was made by a Government witness … shall be the subject of

subpoena, discovery, or inspection until said witness has testified

on direct examination in the trial of the case."   18 U.S.C.

§ 3500(a) (emphasis added).   The Third Circuit has consistently

explained that a district court cannot compel early production of

Jencks Act material.   <u>See, e.g.</u>, <u>United States v. Higgs,</u> 713 F.2d

39, 44-45 (3d Cir. 1983); <u>United States v. Murphy</u>, 569 F.2d 771,

773 (3d Cir. 1978), cert. denied, 435 U.S. 955 (1978); <u>United States

v. Kenny</u>, 462 F.2d 1205, 1212 (3d Cir.), cert. denied, 409 U.S. 914

(1972).   As the Circuit stated in <u>Murphy</u>:

> The blunt command of the statute together with the
> unequivocal legislative history has led to unbroken
> precedent in the Courts of Appeals denying to district courts
> the power to compel production of the statements of
> government witnesses until conclusion of direct examination
> at the trial.

569 F.2d at 773.   <u>See also</u> <u>United States v. Giampa</u>, 904 F. Supp.

235, 282 (D.N.J. 1995).

There is no reason to believe that these materials will be in any way voluminous.   To avoid delays and allow some time for the defendant to prepare cross examination of government witnesses, the government will voluntarily agree to disclose witness identities and provide Jencks statements and any criminal histories of witnesses at a reasonable time before trial, as is this Office's typical practice.   Furthermore, the Government has already provided defense counsel with a summary of what the Government expects its witnesses to testify to at trial. [24]

14.   <u>Evidence that Government Witnesses suffer from physical or mental disabilities, drug addiction, alcohol addiction, or emotional disturbance:</u> The Government is treating this request as falling under our obligations under <u>Giglio</u>, discussed above, and will provide such materials at an appropriate date.

15.   <u>Empanelment and Grand Jury Dates of Grand Jury, Instructions to the Grand Jury, Voting Record, and Transcript of Return in Open Court of the Indictment</u>:   A keystone of the

---

[24] This summary was provided to Parfaite's defense counsel on August 10, 2021.

federal grand jury is the cloak of secrecy which attaches to grand

jury proceedings.   That rule of secrecy is prescribed by Rule 6(e)

of the Federal Rules of Criminal Procedure.   The rule, in its

current form, generally forbids disclosure of "matters occurring

before the grand jury." Rule 6(e)(2).   Grand Jury testimony and/or

summaries of grand jury witnesses are considered matters before

the Grand Jury. United States v. Smith, 123 F.3d 140 (3d Cir.

1997).   As such, the Government will treat the testimony and

instructions given to the grand jurors during the presentation of

the current indictment, as Jencks material, and disclose it to the

defendants approximately three days prior to trial. Administrative

information, such as empanelment and grand jury dates, however,

is not a "matter occurring before the grand jury." See In re Grand

Jury Investigation (Diloretto), 903 F.2d 180, 182 (3d Cir. 1990);

See also, United States v Murphy, 646 Fed. Appx. 153, 155-156

(3d Cir 2016).   Nevertheless, defendant Parfaite has failed to

establish under what basis he demands this discovery as it falls

outside the scope of discoverable material under Rule 16 or the

other discovery provisions as discussed above.

16.   <u>Any information that may result in lower sentence under the</u>

<u>Guidelines:</u> Here, defendant's request that the government reveal

material mitigating of punishment encompasses far more than

either exculpatory or impeachment evidence under <u>Brady</u> or any

of the federal discovery rules or applicable legal precedent.

<u>Brady</u> does not mandate open file discovery.   The government

need not disclose: (1) neutral, irrelevant, speculative, or

inculpatory evidence; (2) evidence available to the defense from

other sources; (3) evidence the defense already possesses; or (4)

evidence that the prosecutor could not reasonably be imputed to

have knowledge or control over.   See, e.g. <u>United States v.</u>

<u>Jackson</u>, 649 F.2d 967, 972 (3d Cir. 1981) (irrelevant evidence not

<u>Brady</u>); <u>United States v. Bryan</u>, 868 F.2d 1032, 1037 (9th Cir.

1989) (neutral evidence is not exculpatory); <u>United States v.</u>

<u>Dillman</u>, 15 F.3d 384, 390 (5th Cir. 1994) (neutral evidence is not

<u>Brady</u>); <u>United States v. Agurs</u>, 427 U.S. 97, 109-110 (1976)

(speculation that government's files may contain exculpatory

evidence insufficient to require disclosure);   DeMartino v. Weidenburner, 616 F. 2d 708, 712-13 (3d Cir. 1980) (inculpatory evidence does not require disclosure); United States v. Perdomo, 929 F. 2d 967, 973 (3d Cir. 1991) (no Brady violation where defendant, using reasonable diligence, could have obtained the information);   United States v. Dunn, 851 F. 2d 1099, 1101 (8th Cir. 1988) (government has no affirmative duty to discover potentially exculpatory information which it neither possessed nor of which it was aware).

Ever mindful of its continuing obligations under Brady to disclose any exculpatory evidence which may come into the custody of the government in the future, there is simply no requirement in the present matter that the government search for or reveal evidence that is mitigating of punishment or which "may result in a lower sentence under the Guidelines."

The government has thus far complied with its discovery obligations in this matter.   Accordingly, the defendant's motion should be dismissed.

## 2. Motion for Severance or Suppression of Co-Defendant's Statements

Multiple defendants may be charged and tried together where, as here, "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Where the defendants are charged with a conspiracy, compliance with Rule 8(b) is usually satisfied. See, e.g., United States v. Baltas, 236 F.3d 27, 33 (1st Cir. 2001); United States v. Montgomery, 262 F.3d 233, 244 n.5 (4th Cir. 2001). Here, both defendants are charged together for conspiring to distribute heroin and methamphetamine, and the possession with intent to distribute the heroin and methamphetamine recovered from Defendant Parfaite's motel room on February 23, 2021 (Counts One, Six, and Seven). Defendant Luce is further charged with distributing heroin and methamphetamine (Counts 2 through 5). In two of four additional counts where Luce is the only defendant charged, (Counts 4 and 5) he is alleged to have distributed the drugs from the motel room rented in Defendant Parfaite's name.

Following appropriate joinder, defendants may have their trials severed should joinder give rise to undue prejudice.   Fed. R. Crim. P. 14(a).   The decision whether to sever defendants rests with the sound discretion of the trial court. United States v. Boyd, 595 F.2d 120, 125 (3d Cir. 1978).   The Court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Zafiro, 506 U.S. 534, 539 (1993).   Here, Parfaite moves for severance due the possible prejudicial nature of his co-defendant's statements against him.

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the Confrontation Clause of the Sixth Amendment was violated when the out-of-court confession of one defendant, implicating another defendant, was admitted during the two defendants' joint jury trial, and the confessing defendant did not take the stand and was therefore not subject to cross-examination by the other defendant.   In Crawford v. Washington, 541 U.S. 36 (2004), the Court held that

"testimonial" hearsay statements cannot be admitted against a criminal defendant unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.

Here, the proffered reasons for severance fall short of establishing a clear and substantial prejudice from a joint trial.   First, much of the evidence at trial will be introduced to prove the existence of a drug trafficking conspiracy between Parfaite, Luce, and uncharged co-conspirators, both known and unknown.   Should the jury agree, it would appropriately and justifiably attribute some or all of that evidence to all defendants charged in each respective conspiracy.   Acts committed by one co-conspirator in furtherance of the conspiracy become admissible against all co-conspirators. United States v. Hart, 273 F.3d 363, 370 (3d Cir. 2001) (rejecting spillover effect argument advanced in support of severance motion).   Prejudicial spillover warranting severance is an unlikely occurrence where, as here, defendants are charged under the same conspiracy count. United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998).

This is precisely why "[p]rincipals of judicial economy often favor a

joint trial when a conspiracy is charged."   McGlory, 968 F.2d at 340;

see also United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991)

("The public interest in judicial economy favors joint trials where the

same evidence would be presented at separate trials of defendants

charged with a single conspiracy.").   Indeed, should severance be

granted, the government would present substantially identical evidence

at the separate trials.   "Joint trials generally serve the interests of

justice by avoiding inconsistent verdicts and enabling more accurate

assessment of relative culpability-advantages which sometimes operate

to the defendant's benefit. Even apart from these tactical

considerations, joint trials generally serve the interests of justice by

avoiding the scandal and inequity of inconsistent verdicts."

Richardson v. Marsh, 481 U.S. 200, 210 (1987).

The jury ultimately will decide whether evidence of the heroin and

methamphetamine trafficking conspiracy charge should be attributed to

a certain defendant alone, guided by the appropriate limiting

instruction.   See 3d Cir. Model Instr. § 3.14.   Counsel may argue

accordingly, and "juries are presumed to follow their instructions."

Richardson, 481 U.S. at 211.   Moreover, to the extent there is any evidence introduced against Luce or Parfaite alone, the operative query is "whether the jury could have been reasonably expected to compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence." United States v. DePeri, 778 F.2d 963, 984 (3d Cir. 1985).

Here, Luce and Parfaite are charged with heroin and methamphetamine conspiracy, as well as the substantive possession and distribution of each. The facts and evidence that will be introduced to prove these charges are "relatively straightforward and discrete" and thus easily compartmentalized by a jury. United States v. Lore, 430 F.3d 190, 205 (3d Cir. 2005) (affirming denial of severance for coconspirators charged with labor union embezzlement when the facts did not involve "overly technical or scientific issues.").

Parfaite has also failed to show that Luce's statement to law enforcement would give rise to a Confrontation Clause concern.   As a general matter, a defendant may be deprived of his or her right under the Confrontation Clause when a non-testifying co-defendant's

incriminating testimonial statement is introduced at their joint trial, even if the jury is instructed to consider that statement only against the co-defendant.   See Bruton v. United States, 391 U.S. 123 (1968).

In this case, each defendant made inculpatory out-of-court statements against themselves and their co-defendant.   At this time, it is unknown if either defendant would agree against their co-defendant. If either defendant does agree to testify the availability of cross-examination will eliminate any associated potential Bruton issue.   See Nelson v. O'Neil, 402 U.S. 622, 624 (1971).

Furthermore, even if neither defendant agrees to testify against the other charged co-conspirator, each defendant's statement can be redacted in order to remove any potential prejudice.   The Government has provided proposed redacted versions of each defendants' statements to defense counsel. The same proposed redacted version of each statement are also attached to this response as Attachments "C" and "D".

Bruton does not bar the use of a redacted co-defendant's statement just because that statement becomes incriminating when

linked with other evidence adduced at trial.   United States v. Ford,
2014 WL 3823910 (6th Cir. August 5, 2014)("Any conclusion by the jury
that Perdue's statement implicated Ford might be made only by linking
the statement to other evidence.   Introduction of the statement did not,
therefore, violate the Bruton rule.") There is no Bruton violation where
the co-defendant's statement, standing by itself, does not necessarily
implicate the other defendant, and proper limiting instructions are
given.   United States v. Jass, 569 F.3d 47 (2d. Cir. 2009).

     In the Third Circuit, the use of redacted statement is authorized,
although the redactions "must be so thorough that the statements must
be linked to other evidence before it can incriminate the co-defendant.")
United States v. Hardwick, 544 F.3d. 565, 573 (3d Cir. 2016).   In
Hardwick, the Third Circuit compares two of its earlier decisions
regarding the constitutionality of redacted confessions.   Hardwick, 544
F.3d at 573.   In those earlier cases, United States v Richards, 241 F.3d
335 (3d Cir. 2001), and Priester v. Vaughn, 382 F.3d 394 (3d Cir. 2004),
different redacted statements were analyzed to show if they
unequivocally pointed to the co-defendant. In Richards, the term

"friend" was found to be in violation of the Confrontation Clause because other evidence showed the defendants were friends, and the term was "Just as blatant and incriminating…as the word "deleted" in the <u>Gray</u> case. <u>Hardwick</u>, 544 F.3d at 473(quoting Richards, 241 F.3d at 341).   In <u>Priester</u>, however, the terms, "other guy," "someone else," "the guy", and "another guy" did not violate the Confrontation Clause between there were at least fifteen perpetrators in various car involved in the shooting [in that case].   <u>Hardwick</u>, 544 F.3d at 573 (quoting <u>Priester</u>, 382 F.3d at 399).

Here, the redacted statements of Luce and Parfaite are much more akin to the statements in <u>Priester</u> than in <u>Richards</u>.   All by-name reference to either co-defendant has been redacted.   The remaining inculpatory statements could just as well refer to the four other individuals found in the Paramount Motel Room, as they would to the either co-defendant. Furthermore, the statements would only incriminate the other co-defendants when linked to the plethora of other evidence which the Government will likely introduce at trial, such as the physical evidence recovered from the motel room, including the

45

ledger containing the drug customer names and Parfaite's cash-app
passwords, the pre-recorded buy money found on Parfaite, the motel
room key found on Parfaite, the testimony of the other individuals in
the room who observed Parfaite and Luce distribute controlled
substances, the testimony of other customers who purchased controlled
substances from Parfaite and Luce, the testimony of co-conspirator
Sparano, who sold controlled substances to both Parfaite and Luce, and
the text communicates between Luce and Parfaite showing that they
conspired to purchase and distribute controlled substances together.

Here, severance would require the government to present at two
separate trials with substantially identical evidence concerning both
narcotics charges.   This result would undermine judicial efficiency and
economy, and thus has been rejected repeatedly throughout the Third
Circuit.   See, e.g., United States v. Schueg, 2015 WL 5530214, at *4
(M.D. Pa. Sept. 18, 2015) (Kane, J.); United States v. Harvey, 2014 WL
657595, at *6 (W.D. Pa. Feb. 20, 2014).

Accordingly, and without showing the potential of prejudice that
cannot be mitigated through the use of the proposed redacted

statements attached herein, the motion for severance must fail.

### 3. Motion to Suppress Statement of Defendant

Defendant Parfaite also moves for the suppression of his audio recorded statement because claims that he invoked his right to counsel and was, nevertheless, questioned without counsel present.   He further argues his waiver of <u>Miranda</u> was not voluntary because he had been handcuffed to the wall of the holding cell for over an hour and because he was "high as a kite."

Because custodial interrogations by their nature generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966), the United States Supreme Court imposed a duty upon police officers to follow certain procedures in dealing with an accused.   Before the police can initiate questioning, they must apprise the accused of his constitutional rights and more particularly, the right to remain silent, the right to counsel and the consequences of waiving those rights, *i.e.*, the use of the statement in future criminal proceedings. <u>Id.</u> at 468-70.   As a necessary

47

corollary of these procedures, <u>Miranda</u> requires that the police fully respect an accused's exercise of any of these rights. <u>Moran v. Burbine</u>, 475 U.S. 412, 420 (1986).

Continued questioning of a custodial defendant after an assertion of the right to counsel is unlawful unless the defendant initiates further conversation. <u>Edwards v. Arizona,</u> 451 U.S. 477 (1981).  The <u>Edwards</u> rule serves as an absolute prohibition on further interrogation only if an accused invokes his right to counsel for all purposes.  See <u>Connecticut v. Barrett</u>, 479 U.S. 523, 529-30 (1987) (holding that defendant's request for an attorney before any written statement was provided did not constitute a request for an attorney for purposes of an oral confession); <u>United States v. LaGrone</u>, 43 F.3d 332, 338 (7th Cir.1994) (request to see attorney before signing consent to search did not prohibit further oral interrogation absent additional invocation of right to counsel).

In <u>Edwards,</u> the Supreme Court recognized that the per se rule of no interrogation in right to counsel cases was relevant "unless the accused himself initiates further communication, exchanges, or

conversations with the police." 451 U.S. at 485.   The purpose of the per se rule of <u>Edwards</u> was to establish "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers...."   <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1044 (1983).   <u>See also</u> <u>Michigan v. Harvey,</u> 494 U.S. 344, 350 (1990).   There is no need to apply a per se rule of exclusion when an accused initiates the contact because there is no longer a presumption of coercion.   Rather, the inquiry then becomes one of waiver.   If re-interrogation occurs, the court must determine "whether the purported waiver [of the right to counsel] was knowing and intelligent and found to be so under the totality of the circumstances." <u>Id.</u> at 1045, quoting <u>Edwards v. Arizona,</u> 451 U.S. at 486 n.9.

Here, the defendant argues that, assuming Parfaite had made any invocation of his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police."   <u>Edwards,</u> 451 U.S. at 484-85.   The Government does not dispute the general legal accuracy of

that statement.   However, the instant facts do not fit squarely into the statement, first, and most importantly, there is no evidence that Defendant Parfaite ever asked for an attorney except during the course of his recorded interview. Secondly, after asking about "where" his attorney was, Parfaite re-initiated the conversation with police by telling the detectives that they had come to the motel on the "*day with the least amount of activity*."

In this case, the recorded interview evidences that the defendant was fully and fairly apprised verbally and in writing of his constitutional right to remain silent.   The defendant was further advised that he could cease all questioning at any time. Nevertheless, the defendant agreed to speak to law enforcement and signed a form consenting to answer questions without a lawyer present.

At approximately the 16:44 minute mark of the defendant's recorded interview, defendant Parfaite becomes upset and states, "*Where if the fuck is my lawyer? I asked for my lawyer when they patted me on the ground.*"  Law enforcement's immediate response was to stop questioning Parfaite about the distribution of the drugs, but

instead made an innocuous comment about Parfaite's recent tattoo which Parfaite was scratching at: "*That's actually a pretty fucking dope tattoo bro. Don't do that, it's going to scab up.*[25] (At approximately 16:55minute mark.)   Defendant Parfaite then re-initiated the conversation about the distribution of controlled substances by stating, "*like literally we had just cleaned everything up. I'm going to take a piss and they kick in the door.   Picked a helluva day to come, picked the day with the least amount of activity*"(17:07)

During the end of the interview, Defendant Parfaite again becomes upset and asks for an attorney (29:35) Here, Parfaite's unequivocal demand is met by an immediate response by the interviewers to cease the questioning and end the recorded interview. These actions by the interviewers, to immediately cease the questing, highlight the ambiguous nature of Parfaite's earlier statements at the approximately 16:44 minute mark.   There, his "invocation" was ambiguous and almost he almost instantly re-initiated the conversation regarding drug trafficking in the Paramount Motel. Accordingly, the

---

[25] Referring to Parfaite scratching at his tattoo.

interviews continued to question Defendant Parfaite.    At this later

moment, however, Parfaite is unambiguous about his desire to speak

with an attorney, and the interviewers respond immediately and

correctly by ceasing all further questioning.

The recorded interview clearly shows that the defendant did not

invoke his right to counsel until the end of the interview (29:35 minute

mark).   At no time prior to the start of the recorded statement had

Defendant Parfaite asked to speak with an attorney, and it is clear from

the recorded statement that he voluntarily, intelligently, and knowingly

waived his <u>Miranda</u> rights before speaking with the investigators.

Furthermore, in the midst of the interview, Parfaite merely asks where

his attorney is, before immediately re-initiating the conversation about

drug distribution from his hotel room. Only at the end of the interview

does Defendant Parfaite make a clear statement of invocation of his

right to counsel, an invocation which is immediately honored.

Finally, to determine the voluntariness of a confession, the court

must consider "the totality of the circumstances" to determine if "the

defendant's will was overborne when he confessed."   <u>Miller v. Fenton</u>,

796 F.2d 598, 604 (3d Cir. 1986) (citations omitted); United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005).   The Supreme Court has made clear that "the crucial element [is] police overreaching"; "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."   Colorado v. Connelly, 479 U.S. 157, 167 (1986).   "The central question is whether the authorities coerced the defendant's confession; if not, then the confession is voluntary." United States v. Bethancourt, 65 F.3d 1074, 1078 (3d Cir. 1995).

A confession is voluntary if, in the totality of the circumstances, it is "the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will."   United States v. Huerta, 239 F.3d.

Here, the defendant argues that his confinement in the holding cell for approximately one hour, while handcuffed to the cell's wall, and the officer's knowledge that he was high during the interview mitigates his full knowing and voluntary waiver of his Miranda rights prior to

speaking with detectives.   This assertion is belied by the recorded interview which shows the defendant to be alert, aware, and fully capable of carrying on a meaningful conversation with detectives. Additionally, the short amount of time in which he was detained at the MCDA, for both his state parole warrant, and for possible state charges, was only a few hours, at most.   The search warrant was executed at the Paramount Motel at approximately 6:00 a.m., and Defendant Parfatie's interview began at the MCDA at 9:50 a.m.

Furthermore, while waiting to be interviewed, Defendant Parfaite was given multiple opportunities for beverages and bathroom breaks. Once such opportunity was during the recorded interview, where one detective left to get Defendant Parfaite on request.   Taken in the totality of the circumstances, it is clear that Defendant Parfaite made a full, knowing, and voluntary waiver of his Miranda rights, and that his invocation of his right to an attorney, if it came at all, only occurred at the very end of his recorded statement and was immediately honored by the interviewing detectives.

4.  __Motion for Discovery of Co-Defendant and Co-conspirators__

   __Statements__

   The Government has provided both defendants with full un-
redacted copies of each co-defendant's statements made to law
enforcement (Attachments A and B).   The Government has also
supplied the full unredacted statement of uncharged co-conspirator,
Michael Sparano, to both defendants.   All notes, reports, and other
writings created by law enforcement which reflect any statements made
by the co-conspirators.   The only recorded statements of any of the co-
conspirators which has not been provided to the defendant's are the
recorded conversations between the CIs and Defendant Luce.
Recordings of these conversations are in the Government's possession
and will be available for inspection by defense counsel and defendants
at the U.S. Attorney's office, upon request, in order to protect the
identity of the confidential informants.

5.  __Motion for a *James* Hearing__

   Beyond the post-arrest statements made by both co-defendants,
described above, the Government will also seek to introduce statements

made by the co-conspirators during the course of their conspiracy. These statements will consist of text message conversations between the co-conspirators, as well text messages made by the co-conspirators made in furtherance of the conspiracy.[26]   Federal Rule of Evidence 801(d) defines certain types of statements that are not hearsay.   One such type are statements made by a party's coconspirator during and in furtherance of the conspiracy. FRE 801(d)(2)(E).

In order for an out-of-court statement to meet the co-conspirator exception, the district court must find by a preponderance of the evidence, the following: that (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. United States v. Weaver, 567 F.3d 178, 181 (3d Cir. 2007). The definition of made in furtherance of the conspiracy should also be given a broad interpretation.   United States v. Gibbs, 739 F.2d 838,

---

[26] The Government uses "text messages" to include SMS messages, other types of text messages, and other electronic communications, either through Facebook or other social media applications, that, for all intents and purposes, act as text messages.

845 (3d Cir. 1984).

Here, all the statements intended to be introduced at trial by the Government meet all four requirements by a preponderance of the evidence.   The evidence for the conspiracy will be introduced throughout the Government's case, but will include multiple witness testimonies, physical evidence, and coconspirator confessions, as discussed above.   All statements will be made by the co-conspirators speaking to one another, or to actual or potential buyers/sellers of controlled substances.   Additionally, as both defendants are charged with conspiracy to distribute controlled substances between on or about November 26, 2020, and February 23, 2021, all the statements will take place between those two dates.   Finally, all statements will be made in furtherance of the conspiracy, in that they go directly to sales or purchases of controlled substances, or to establish other acts within the conspiracy, such as the introduction of new potential purchasers, or to maintain the relationship between suppliers, purchasers, or co-conspirators.   Weaver, 507 F.3d at 192 ("Statements between conspirators which provide reassurance, serve to maintain trust and

cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of <u>Rule 801(d)(2)(E)</u> are met." quoting <u>United States v. Ammar</u>, 714 F.2d 238, 252 (3d Cir. 1983).

Within the above-described parameters, trial courts have wide discretion in determining the admissibility of co-conspirator statements. <u>United States v. Mastropieri</u>, 685 F.2d 776, 789 (2d Cir. 1982). A pre-trial hearing as outlined in <u>United States v. James</u>, as recommended by the defendant, is not the only, nor even the preferred method adopted by most courts of appeal.   590 F.2d 575, 582 (5th Cir. 1979); <u>United States v. Hoover</u>, 246, F.3d 1054, 1060 (7th Cir. 2001)(<u>James</u> hearing is not the only or even the best method to determine admissibility).

Instead of ordering a pre-trial hearing to determine whether the government will establish the existence of a conspiracy in this case by a preponderance of the evidence, the preferred method adopted by most courts, including the Third Circuit, is to admit evidence of a conspiracy provisionally and, if not connected through the course of trial, issue a cautionary instruction to the jury.   <u>Ammar</u>, 714 F.2d at 246 (<u>James</u>

hearing not required); <u>United States v Vinson</u>, 606 F.2d 149, 152 (6th Cir. 1979)(<u>James</u> hearing not required); <u>United States v. Hoover</u>, 246, F.3d 1054, 1060 (7th Cir. 2001)(<u>James</u> hearing is not the only or even the best method to determine admissibility). <u>But see</u> <u>United States v. Gonzalez-Montoya</u>, 161 F.3d 643. 648-649 (10th Cir. 1999)(<u>James</u> hearing required).

6. <u>Motion for Disclosure of Identifying Information Regarding Confidential Witnesses</u>

Courts have long recognized that effective law enforcement and the protection of the public interest require that the government be permitted, absent exigent circumstances, to withhold the identity of informants.  <u>Rovario v. United States</u>, 353 U.S. 53, 59 (1957); <u>see also</u> <u>McCray v. State of Illinois</u>, 386 U.S. 300, 309 (1967) (the privilege "is well-established, and its soundness cannot be questioned").

The reason for this rule has been described as follows:

a genuine privilege, on . . . . fundamental principle . . . . must be recognized    for the identity of persons supplying

the government with information concerning the commission of crimes.   Communications of this kind ought     to receive encouragement.   They are discouraged if the informer's identity is disclosed.   Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity – to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution against him. The government also has an interest in nondisclosure of the identities of informers.   Law     enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the    dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship. That the government has this privilege is well established and its soundness cannot be questioned."

McCray, 386 U.S. at 308 (quoting Wigmore, Evidence 2374).

The Supreme Court in Rovario established a balancing test to be applied by trial courts.   The right of the accused to prepare his defense must be balanced against the government's and the public's interest in protecting the confidentiality of informants.   Before the court will engage in such a balancing test, the defendant must set forth and articulate a specific need for disclosure.   The defendant has the burden of establishing this specific need for disclosure of the confidential informant.   United States v. Jiles, 658 F.2d 194 (3d Cir. 1981).

60

Speculation that the disclosure might be helpful does not meet the standard set by Rovario and affirmed by the Third Circuit in United States v. Bazano, 712 F.2d 826, 839 (3d Cir. 1983) (en banc) (holding that the defendant could not compel identification of a confidential informant by presenting only vague reasons for needing the informant's identity); Jiles, 658 F.2d at 197 ("The mere speculation that an eyewitness may have some evidence helpful to defendant's case is not sufficient to show the specific need required by Rovario."); United States v. Brenneman, 455 F.2d 809, 811 (3d Cir. 1972) (finding that the defendant's speculation that an informant's testimony might be useful for impeachment purposes was insufficient to meet his burden of demonstrating a specific need for the informant's identity).

In United States v. Sharp, 778 F.2d 1182 (6th Cir. 1985), the Sixth Circuit held that a defendant was not even entitled to have an informant questioned *in camera* in the absence of some evidence substantiating the proffered defense.   See also United States v. Kerris, 748 F.2d 610 (11th Cir. 1984); United States v. Whitley, 734 F.2d 1129 (6th Cir. 1984) (informant disclosure denied in view of dearth of evidence

that informant's testimony could help establish a defense).

The government's privilege will give way only if the defense makes an adequate showing that disclosure is ". . . . essential to a fair determination of a cause." <u>Rovario</u>, 353 U.S. at 60-61 (emphasis added).   The rule applies even where the informant is an eyewitness to events involved in the case.   <u>Jiles</u>, 658 F.2d at 197. *See also* <u>United States v. Johnson</u>, 677 F.3d 138, 143 (no abuse of discretion by denying disclosure of identity because witness testimony was corroborated by police).   Only upon a specific showing by the defendant should a court consider whether the defendant's interests are sufficiently strong to overcome the government's privilege of nondisclosure.   <u>Jiles</u>, 658 F.2d at 196-97.

The defendant has failed to make that showing here.   The Government, in August of 2021, provided a summary of the expected testimony of the confidential witnesses in this case.   Defendant Parfaite nevertheless asserts that one confidential informant, CI#1, is an eyewitness to the alleged conspiracy charge, presumably because they made purchases of controlled substances from Parfaite's Motel

Room.   Defendant Parfaite asks for the informant's information be provided because "there is exculpatory impeachment information about this witness that would cast doubt on his or her credibility which needs to be disclosed."   Def. Brief at 27.   This demand is unusual, in that in making this request,the defendant seems to know the identity of the Confidential informant already, hence their knowledge that there he or she possesses exculpatory impeachment information.   The Defendant also demands the identifying information of CI #2, on the basis that "he/she may lead to a first-hand source or circumstantial evidence."   Id.

Because both of these demands fail to establish a specific need for the confidential informants' identifying information, in that the need is either moot or unduly speculative, this motion must be denied.

### 7. Motion *in Limine* to Exclude Search Warrant Photographs

Finally, Defendant Parfaite asks for the exclusion of the photographs taken inside his motel room after federal agents searched that room pursuant to a federal search warrant.

Fed. R. Evid. 401 deems admissible any evidence that has a tendency to make a fact of consequence to determining the action more

or less probable.   "Rule 401 does not raise a high standard."   United States v. Starnes, 583 F.3d 196, 214 (3d Cir. 2009).   Here, the probative value of the anticipated testimony readily overcomes any potential prejudice.   FRE 901.

The government anticipates testimony from several federal agents and local law enforcement investigators who were present in the room during the search of the motel room and while the photographs were taken.   These witnesses will establish the authenticity of the photographs and their relevance to this case. The Court can best make a determination whether to admit the photographs taken of Defendant Parfaite's motel room at that time.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny all of defendant's motions.

Respectfully submitted,

 s/ James M. Buchanan 
JAMES M. BUCHANAN
Assistant United States Attorney
P.O. Box 309
Scranton, PA 18501-0309
(570) 348-2800 (telephone)
(570) 348-2830 (facsimile)

Dated: November 8, 2021

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 3:21-CR-56 |
| -vs- | : | |
| | : | (J. Mannion) |
| WALTER KENNETH PARFAITE, | : | |
| a/k/a "Kenny" | : | |
| Defendant | : | (Electronically filed) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on November 8, 2021 she served a copy of the attached:

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S PRE-TRIAL MOTIONS

by electronic filing upon:

Carl J. Poveromo, Esq.
*Attorney for Defendant Walter Kenneth Parfaite*

/s/ Sarah M. Duffy
SARAH M. DUFFY
Legal Assistant

66